714 So.2d 391 (1998)
Jason James MAHN, Appellant/Cross-Appellee,
v.
STATE of Florida, Appellee/Cross-Appellant.
No. 83423.
Supreme Court of Florida.
April 16, 1998.
Rehearing Denied July 15, 1998.
*393 Nancy A. Daniels, Public Defender, and W.C. McLain, Assistant Public Defender, Second Judicial Circuit, Tallahassee, for Appellant/Cross-Appellee.
Robert A. Butterworth, Attorney General, and Barbara J. Yates, Assistant Attorney General, Tallahassee, for Appellee/Cross-Appellant.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon appellant Jason James Mahn. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm Mahn's first-degree murder convictions but vacate the sentences of death and remand with directions that the trial court impose a sentence of life imprisonment without eligibility of parole for twenty-five years for Debra Shanko's killing and conduct a new sentencing proceeding for Anthony Shanko's murder.

FACTS
Jason Mahn was convicted of killing his father's live-in girlfriend and her son. Mahn was nineteen years old at the time of the killings. The record reflects that Mahn's parents divorced in 1974 in Wisconsin when he was less than one year old and he had no further contact with his father, Michael Mahn, until 1992 when Mahn turned eighteen and moved from Texas to Pensacola, Florida, in an attempt to form a relationship. Mahn stayed at his father's house, on and off, for four months during the next year, as he attempted to support himself, sharing the home with his father, his father's longtime girlfriend, Debra Shanko, and her fourteen-year-old son, Anthony Shanko. Mahn's attempt to reconcile with his father failed and culminated in the killings here. Mahn was charged and found guilty of two counts of first-degree murder and one count of armed robbery and was acquitted of cruelty to animals and criminal mischief charges.
On April 1, 1993, after an extended absence, Mahn moved back into the home of his father. Michael had purchased a car for Mahn but the car had to be sold because Mahn could not pay the repair bills. The car was taken from Mahn and delivered to the new owner that day after Mahn got off work from a nearby restaurant. That night, Mahn's father left the house between 9:30 and 9:45 p.m. to go to the Carousel Lounge. At that time, Mahn was in his room, Anthony was asleep, and Debra was exercising with weights in her bedroom.
Michael Mahn returned home at approximately 1 a.m. on April 2, 1993. He immediately noticed that Debra's car was gone, the garage door was open, and the front door of the house was unlocked and slightly open. Mr. Mahn entered the house, observed bloodstains on the floor and walls, and found Debra's body lying across the hallway. Mr. Mahn heard Anthony call out from the master bedroom "she's dead ... Mahn did it ... [c]all 911." When he got to the bedroom, *394 Mr. Mahn found Anthony alive but severely injured from several stab wounds. Before being placed in an ambulance, Anthony told a police officer that Mahn was his assailant. Anthony was immediately prepared for surgery at the hospital, but he died of cardiac arrest. Anthony's autopsy revealed six stab wounds with one fatal blow to the chest. Debra had numerous stab wounds, five of which were potentially fatal. The medical examiner concluded that Debra "[e]ssentially bled to death."
Mahn was subsequently arrested in Oklahoma and made two statements to the Oklahoma police. He confessed to the murders, explaining that he acted out of hate and frustration with his father. In one of the statements, he also indicated that he was on drugs at the time of the offenses. He told police that he walked into Anthony's bedroom around 11 p.m. and stabbed him with a knife he had obtained from the kitchen. When Anthony screamed, Debra came into his room and Mahn stabbed her also. He attempted to flee but could not find the keys to his father's car. Debra, who was still alive and had managed to return to her bed, told Mahn to take her car and leave. Mahn then fled in Debra's car, after breaking the car's window and taking with him $400 he found in her bank bag in a drawer.
During the penalty phase, Mahn testified in his own defense, describing the life of physical and mental abuse he endured beginning at an early age, and his drug abuse which continued up until the murders. He told the jury that he was coming off an LSD-induced high at the time of the murders and that he acted out of spite against his father. He said he loved Debra Shanko, considered her a friend, felt sorry for her death, and had positive feelings toward Anthony Shanko also.
Mahn's step-grandmother, Maxine Laue, testified in detail about Mahn's troubled early life and his unsettling formative experiences. She related that Mahn's father, Michael Mahn, deserted Mahn and his mother when Mahn was only three months old and never took any interest in him thereafter. She also testified that his mother, Roxanne Thortis, constantly abused him and always considered him a burden. Among other things, Mahn's mother openly used drugs in the house, physically abused her son, screamed at him constantly, and engaged in sexual relationships with a series of men in the home, sometimes openly in Mahn's presence.
Mahn's mother, Roxanne Thortis, gave even more vivid and detailed evidence of Mahn's abuse and deprived childhood as well as her role in the abuse. She testified that they lived in at least nine different places, and Mahn was in and out of at least seven different schools during his childhood. She said that Mahn was without a father figure throughout his life. Mahn's mother beat him repeatedly with a multitude of weapons, including a wooden spoon, a belt, and, on one occasion, a lead pipe. Thortis testified that through the numerous beatings he suffered, Mahn never raised a hand to her. In addition to vividly describing her own physical abuse of her son, she detailed how her numerous boyfriends beat Mahn, sometimes in tandem with her own beatings of him. Thortis's sister, Reanne, also testified about the many times she saw her sister beat Mahn, and confirmed that Mahn was always the passive victim in these violent episodes, never striking back at his abusive mother.
Three of Mahn's friends testified that he continually and excessively abused drugs and alcohol after his recent move to Florida. Steven Comb testified that Mahn drank alcohol heavily and together they frequently used numerous drugs, including cocaine at least ten times and LSD four or five times. Eddie Peterson testified that Mahn drank every day of the thirty-five to forty days Mahn lived with him immediately before the murders. David Keith Butler testified that Mahn used LSD on a regular basis, in addition to using crack cocaine, alcohol, and marijuana.
John Lewis Albritton was an attorney who represented Mahn on a 1992 robbery charge. He explained that Mahn was the driver of the vehicle used after Mahn's friend snatched a woman's purse in a Taco Bell parking lot. Albritton testified that the evidence did not indicate Mahn exerted any force against the robbery victim, and that although Mahn *395 agreed to rob someone that night, he said "no, lets not," when his friend indicated a willingness to physically attack the victim in the process.
Dr. John Bingham, a mental health expert, testified that Mahn's personality and behavior were consistent with someone who has abused drugs, including LSD. Dr. Bingham opined that extensive use of various drugs over a period of time could impair a person's ability to conform his conduct to the requirements of the law.
Dr. Charles Thomas, a forensic psychologist, also evaluated Mahn and closely analyzed his October 1991 suicide attempt. Dr. Thomas testified that Mahn took approximately one-hundred aspirin and four Contac tablets, which he described as an "indication of [Mahn's] impulsive type of behavior, not really thinking of the consequences of what he's doing, just focusing on the activity at the moment of what he wants." He diagnosed Mahn as having an antisocial personality disorder, an extremely dysfunctional family background, and a resulting propensity toward criminal behavior. Dr. Thomas explained that the impulsive part of Mahn's personality and aggressiveness toward others is a behavior "common in family settings where there [are] no strong paternal figures or no values that the individual develops out of the family background." He concluded that Mahn was remorseful for his actions, was not psychotic, and had symptoms of a mental disorder. Finally, Dr. Thomas stated that he was unable to say whether those symptoms impaired Mahn's ability to do right and conform his conduct to the requirements of the law. Dr. Thomas testified, however, that Mahn "knew what he was doing at the time of the offense and that he knew it was wrong." He also opined that Mahn "grossly exaggerated his symptoms."
The State's rebuttal expert witness, Dr. James Larson, a clinical psychologist, testified that Mahn did not have any type of mental disease or infirmity. He stated that Mahn denied using drugs or alcohol on the day of the murders and denied having delusions or hallucinations during the murders. Dr. Larson related that Mahn showed no signs of formal thought disorder and was in touch with reality. Dr. Larsen administered three psychological tests to Mahn which produced a "malingering" profile, i.e., "an individual who is trying to either greatly exaggerate his symptoms or completely make up a mental disorder." However, Dr. Larsen acknowledged that "no one test ... can answer that kind of question [about] malingering and the decision about malingering is really a professional judgment." Larson also acknowledged that Mahn's dysfunctional family background played a role in the murders.
After deliberation, the jury recommended life imprisonment for the murder of Debra Shanko and a death sentence for the murder of Anthony Shanko by a vote of eight to four. The trial court overrode the jury's recommendation of life imprisonment for Debra Shanko's murder and sentenced Mahn to death.[1] The trial court also sentenced Mahn to death for the murder of Anthony Shanko. Mahn received a seventeen-year sentence for the armed robbery.

APPEAL
Mahn raises thirteen claims on appeal.[2] *396 We resolve several claims summarily.[3] We address the remaining issues in turn.

GUILT PHASE

Sufficiency of Evidence of Robbery
Mahn does not challenge the sufficiency of the evidence for the murder convictions but asserts that the trial court erred in submitting the armed robbery charge to the jury. Mahn contends that the evidence is undisputed that he only discovered the money he allegedly took in the armed robbery while looking for car keys and that he took the money and one of the family cars as an "afterthought" following the killings.
Mahn argues, and we agree, that the evidence fails to establish an intent to commit a robbery or theft at the time of the homicide. He points out that there was no evidence that the crimes were motivated by a desire to take property. The evidence reflects that Mahn took the money and automobile after the homicides in a desperate and frenzied effort to flee. Although the jury found Mahn guilty of robbery, the jury also indicated, when polled, that the murder convictions were based on a premeditation theory, not a felony murder theory. Importantly too, the trial judge, after the penalty phase, specifically found the taking of the car and money to be an "afterthought," and he concluded the evidence did not support the aggravating circumstance that the homicide was committed during a robbery. See Knowles v. State, 632 So.2d 62, 66 (Fla.1993); Clark v. State, 609 So.2d 513, 515 (Fla.1992).
Recently, in Jones v. State, 652 So.2d 346 (Fla.1995), we again explained the requirement that the threat or force element of robbery be part of a continuous series of events with the taking of the property. We reaffirmed that:
Robbery is "the taking of money or other property which may be the subject of larceny from the person or custody of another when in the course of the taking there is the use of force, violence, assault, or putting in fear." § 812.13(1), Fla. Stat. (1989) (emphasis added). An act is considered "`in the course of the taking' if it occurs either prior to, contemporaneous with, or subsequent to the taking of the property and if it and the act of taking constitute a continuous series of acts or events." § 812.13(3)(b), Fla. Stat. (1989). Thus, a taking of property that otherwise would be considered a theft constitutes robbery when in the course of the taking either force, violence, assault, or putting in fear is used. We have long recognized that it is the element of threat or force that distinguishes the offense of robbery from the offense of theft. Royal v. State, 490 So.2d 44, 46 (Fla.1986), receded from on other grounds, Taylor v. State, 608 So.2d 804 (Fla.1992); Montsdoca v. State, 84 Fla. 82, 93 So. 157 (1922). Under section *397 812.13, the violence or intimidation may occur prior to, contemporaneous with, or subsequent to the taking of the property so long as both the act of violence or intimidation and the taking constitute a continuous series of acts or events.
652 So.2d at 349. Further, while the taking of property after the use of force can sometimes establish a robbery, id., we have held that taking of property after a murder, where the motive for the murder was not the taking of property, is not robbery. Knowles, 632 So.2d at 66; Clark, 609 So.2d at 515; Parker v. State, 458 So.2d 750, 754 (Fla. 1984).
In Jones, we rejected the defendant's "afterthought" argument, noting that the evidence established that after murdering his employers, Mr. and Mrs. Nestor, Jones rolled Mr. Nestor over in order to take his wallet and sometime thereafter rifled through Mrs. Nestor's purse and took some valuables. 652 So.2d at 350. Ultimately, we found Jones' statement to an attending nurse that he killed "those people" because they "owed" him money, dispositive of his "afterthought" claim. Id.
In contrast, we conclude here that the homicides did not occur because Mahn wanted to take $400 and a car. Mahn did not know the money was in the house; instead he found it while trying to find a key to a car. He wanted the car to flee the scene of the murders. Additionally, if taking a car had been his original motive, he could easily have accomplished this at almost any time since he lived in the same household. Instead, the homicides appear to have been the product of Mahn's mental and emotional disturbance and prompted by jealousy for his father's attention. He took the money and car after the violence to effect his escape from the scene. We find that a robbery was not proven beyond a reasonable doubt. See State v. Law, 559 So.2d 187, 188 (Fla.1989) ("A motion for judgment of acquittal should be granted in a circumstantial evidence case if the state fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt.")
Nevertheless, the State asserts that it produced evidence that "to effect his motive of getting revenge on his father, Mahn planned to kill the victims and steal his father's Corvette." Thus, the State argues that the robbery and murders were part of a preconceived design or plan. To that end, the State directs us to Mahn's second videotaped interview with the Oklahoma police. In the interview, Mahn stated that [immediately in the aftermath of the murders] "I tried to take my dad's Corvette first, but I couldn't find the keys. Debbie just said take my car and get out of here." We are unconvinced by the State's argument.
The context of the above passage was Mahn's actions after the murders. Mahn never indicated that he made this determination before the murders as part and parcel of an overall design. Similarly, when questioned by the State during the penalty phase, Mahn stated that he did want to take his father's Corvette after the murders, but clearly stated that was not one of the reasons the murders occurred. Thus, there is no proof that Mahn intended to steal either his father's car or Debra's car prior to the murders.
Likewise, we find that a reasonable hypothesis exists that Mahn did not intend to steal Debra's money prior to the murders. The State relies on Michael Mahn's testimony that Debra "always carried her money in a bag and that it was on the dresser in plain view." However, that fact does not establish that Mahn either knew the moneybag was in his father's bedroom that night or that he intended to steal it. Furthermore, since Mahn testified that he tried to take his father's keys first, and then presumably flee, he would have no reason to take Debra's car keys and the moneybag if he already had his father's keys. That reasonably leads to the conclusion that Mahn took the moneybag as an afterthought in conjunction with his taking of Debra's keys, as he indicated in his statements to the police.
Accordingly, we find that the trial court erred in submitting the armed robbery charge to the jury. Law. Therefore, we reverse Mahn's conviction on this count and remand with directions that this conviction be reduced to grand theft.

*398 PENALTY PHASE

CCP Aggravating Circumstance
Mahn contends that the trial court erred in finding in its sentencing order that the cold, calculated and premeditated (CCP) aggravator was proven beyond a reasonable doubt. As we stated in Geralds v. State, 601 So.2d 1157, 1163 (Fla.1992), "[t]o establish the heightened premeditation required for a finding that the murder was committed in a cold, calculated, and premeditated manner, the evidence must show that the defendant had a `careful plan or prearranged design to kill.'" (quoting Rogers v. State, 511 So.2d 526, 533 (Fla.1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988)). Our review of the record reveals no such advance planning or preconceived design to kill Debra and Anthony Shanko.[4]
As in Geralds, the State's evidence on this issue is circumstantial. Therefore, "to satisfy the burden of proof, the circumstantial evidence must be inconsistent with any reasonable hypothesis which might negate the aggravating factor." Id. at 1163. Mahn has advanced such a reasonable hypothesis, that he was jealous, depressed, and impulsively struck out at the presumed objects of his resentment. In its brief, the State theorizes that Mahn killed Anthony "to get revenge on his father, the real object of his hatred."[5] Consequently, even the State suggests that Mahn acted emotionally out of unresolved hate for his father. Such actions are also consistent with Dr. Thomas' assessment of Mahn's "impulsive type of behavior, not really thinking of the consequences of what he's doing, just focusing on the activity at the moment of what he wants." See Stano v. State, 460 So.2d 890 (Fla.1984) (explaining CCP primarily pertains to perpetrator's state of mind, intent, and motivation), cert. denied, 471 U.S. 1111, 105 S.Ct. 2347, 85 L.Ed.2d 863 (1985). This rash and spontaneous killing evidenced no analytical thinking, no conscious and well-developed plan to kill. Thus, we find insufficient evidence of the heightened premeditation required to establish beyond a reasonable doubt a finding of CCP.
Furthermore, Mahn's actions cannot be described as cold and calculating, as the CCP aggravating circumstance is usually, but not exclusively, applied to "those murders which are characterized as execution or contract murders or witness-elimination murders." Herring v. State, 446 So.2d 1049, 1057 (Fla.), cert. denied, 469 U.S. 989, 105 S.Ct. 396, 83 L.Ed.2d 330 (1984), receded from on other grounds, Rogers v. State, 511 So.2d 526 (Fla.1987); see also Hansbrough v. State, 509 So.2d 1081 (Fla.1987); Bates v. State, 465 So.2d 490 (Fla.1985). There is no evidence that Mahn acted in the deliberate, professional, and coldly calculating manner that is required to establish this aggravator. The evidence reflects that Mahn, using hastily obtained weapons of opportunity, carried out the attacks in a haphazard manner, striking out at Debra, for example, when she confronted him after the attack on Anthony, and then fled in a panic. Therefore, we conclude that as a matter of law, the CCP aggravator cannot be sustained on these facts. Accordingly, we find that the trial court abused its discretion in finding the CCP aggravator applied to these killings. Moreover, because the State argued that the CCP elements were established during its closing penalty phase argument[6] and the jury recommended a death sentence for Anthony's murder by a vote of eight to four, we cannot conclude that the error is harmless beyond a reasonable doubt. State v. DiGuilio, 491 So.2d 1129 (Fla.1986); cf. Lara v. State, 699 So.2d 616, 618-19 (Fla.1997) (finding *399 unconstitutional CCP jury instruction was not harmless error where defendant presented substantial mitigating evidence, including expert testimony on past personality disorders and current borderline disorder, and jury voted seven to five in favor of death sentence); compare Pietri v. State, 644 So.2d 1347, 1353-54 (Fla.1994) (concluding that trial court's erroneous finding of CCP aggravator was harmless error because three other aggravators supported the death penalty and there were no mitigating factors).

HAC Aggravating Circumstance
We conclude the trial court did not abuse its discretion in finding the HAC aggravator. Although Mahn claims he did not deliberately inflict pain and thought the initial stabbings would cause death quickly, the record reflects that Debra Shanko was stabbed numerous times, sustained some defensive wounds, and was still alive when Mahn fled the scene. The record also confirms that Anthony Shanko was stabbed numerous times and sustained several defensive wounds. Although initially asleep when attacked, Anthony's defensive wounds demonstrate he awoke during the attack and attempted to fend off further stabbings.
Considering these circumstances, we find no error in the trial court's findings that the murders were heinous, atrocious, or cruel. See Geralds v. State, 674 So.2d 96 (Fla.), cert. denied, ___ U.S. ____, 117 S.Ct. 230, 136 L.Ed.2d 161 (1996); Allen v. State, 662 So.2d 323 (Fla.1995); Pittman v. State, 646 So.2d 167 (Fla.1994), cert. denied, 514 U.S. 1119, 115 S.Ct. 1982, 131 L.Ed.2d 870 (1995); Haliburton v. State, 561 So.2d 248 (Fla.1990), cert. denied, 501 U.S. 1259, 111 S.Ct. 2910, 115 L.Ed.2d 1073 (1991).

Prior Violent Felony
Mahn argues that the trial court erroneously found his 1992 robbery conviction to support the prior violent felony aggravating circumstance. As we stated in Lewis v. State, 398 So.2d 432, 438 (Fla.1981), the finding of a prior violent felony conviction aggravator only attaches "to life-threatening crimes in which the perpetrator comes in direct contact with a human victim."[7]
However, although we agree with Mahn that his robbery conviction was improperly used as a prior violent felony conviction aggravator, we also agree with the State that this constitutes harmless error since Mahn's contemporaneous convictions for two homicides satisfy the aggravating circumstance for each of the homicides. Windom v. State, 656 So.2d 432, 440 (Fla.) (reaffirming previous holdings that "contemporaneous convictions prior to sentencing can qualify as previous convictions in multiple conviction situations"), cert. denied, 516 U.S. 1012, 116 S.Ct. 571, 133 L.Ed.2d 495 (1995).

Mental/Emotional Disturbance as Statutory Mitigation
The trial court found that no statutory mitigating circumstances were established. The court found the following nonstatutory mitigating factors and accorded them substantial weight: (1) defendant's family background; and (2) abuse of the defendant by his parents. The court found the following nonstatutory mitigating factors and accorded them little weight: (1) defendant's remorse; (2) defendant's potential for rehabilitation; (3) defendant's mental problems that do not reach the level of statutory mitigating factors; and (4) defendant's voluntary confession. Finally, the court gave no weight to the alleged alcohol and drug use/dependency nonstatutory mitigating factor asserted by the defendant.
Mahn contends that the trial court erred in not finding as statutory mitigators that he suffered from an extreme mental or emotional disturbance at the time of the homicides and that his capacity to appreciate the criminality of his acts was substantially impaired. See § 921.141(6)(b), (f), Fla. Stat. (1993). We disagree. The evidence was conflicting on this issue, even among the experts. Our review reveals sufficient competent evidence in the record to support the trial court's finding that these statutory mitigators do not apply. Campbell v. State, 571 So.2d 415, 419 *400 n. 5 (Fla.1990); Cook v. State, 542 So.2d 964 (Fla.1989). Therefore, we find no error.
For the same reasons cited above, we find no abuse of discretion in the trial court's according of little weight to Mahn's mental problems as nonstatutory mitigation. Scull v. State, 533 So.2d 1137 (Fla.1988), cert. denied, 490 U.S. 1037, 109 S.Ct. 1937, 104 L.Ed.2d 408 (1989).

Age as a Mitigating Factor
Mahn asserts that the trial court erred in not finding his age as a mitigating circumstance. He maintains that he is immature for his years and has never become an independent, self-sufficient adult. As evidence of his immaturity, Mahn points to his inveterate drug and alcohol abuse, lifelong mental and emotional instability, poor school history, and poor employment record. The State responds that none of the evidence adduced at trial linked his age to anything that would mitigate his actions.
We have long held that the fact that a defendant is youthful, "without more, is not significant." Garcia v. State, 492 So.2d 360, 367 (Fla.) cert. denied, 479 U.S. 1022, 107 S.Ct. 680, 93 L.Ed.2d 730 (1986). Therefore, if a defendant's age is to be accorded any significant weight as a mitigating factor, "it must be linked with some other characteristic of the defendant or the crime such as immaturity." Echols v. State, 484 So.2d 568, 575 (Fla.1985); see also Sims v. State, 681 So.2d 1112, 1117 (Fla.1996) (finding that "without more," defendant's age of twenty-four was not a statutory mitigator since no evidence showed that his "mental, emotional, or intellectual age was lower than his chronological age"). In this case, we conclude that the trial court abused its discretion in refusing to consider Mahn's age as a statutory mitigator because, unlike the defendant in Sims, there was much "more" than Mahn's chronological age to be considered and which should have compelled the trial court to link those factors to his age or maturity as mitigation. Echols, 484 So.2d at 575. Instead, the trial court rejected the statutory age mitigator by finding as follows in its sentencing order:
The double murder took place on the Defendant's 20th birthday.[8] None of the doctors that testified said that the Defendant was retarded. The Defendant had recently received his GED. The Defendant knew the difference between right and wrong. The Defendant's age at the time of the crime is not a mitigating factor.
However, the record shows that Mahn was far from a normal nineteen-year old boy at the time of the killings. Rather, Mahn had an extensive, ongoing, and unrebutted history of drug and alcohol abuse, coupled with lifelong mental and emotional instability.[9] Mahn's unrefuted, long-term substance abuse, chronic mental and emotional instability, and extreme passivity in the face of unremitting physical and mental abuse provided the essential link between his youthful age and immaturity which should have been considered a mitigating factor in this case. Cf. Campbell v. State, 679 So.2d 720, 725-26 (Fla.1996) (finding trial court erred in not giving requested jury instruction on age as a mitigating circumstance when expert psychological testimony linked defendant's age of twenty-one with his "significant emotional immaturity"). Therefore, we find that the trial court abused its discretion in rejecting Mahn's age as a statutory mitigating circumstance.

Drug and Alcohol Abuse as Nonstatutory Mitigation
We have repeatedly stated that "[w]henever a reasonable quantum of competent, uncontroverted evidence of mitigation *401 has been presented, the trial court must find that the mitigating circumstance has been proved." Spencer v. State, 645 So.2d 377, 385 (Fla.1994) (citing Nibert v. State, 574 So.2d 1059, 1062 (Fla.1990)). A trial court may only reject the proffered mitigation if the record provides competent, substantial evidence to the contrary. Spencer; Nibert; Kight v. State, 512 So.2d 922, 933 (Fla.1987).
Based on those standards, we also agree with Mahn that the trial court erred in giving no weight to his uncontroverted history of drug and alcohol abuse as a nonstatutory mitigating circumstance. See Clark v. State, 609 So.2d 513, 516 (Fla.1992) (finding defendant's extensive history of substance abuse constituted strong nonstatutory mitigation). This is especially true considering that the trial court acknowledged the uncontroverted evidence in its sentencing orders that Mahn "began drinking alcohol at a very young age and would get drunk and fight and cause trouble most of his life ... [and] has used all sorts of illegal drugs in the past." In this case, Mahn's testimony and his prior statements are inconsistent as to whether he was actually under the influence of drugs or alcohol at the time of the murders. Nevertheless, we find no basis in the record for the trial court's characterization that the "evidence... is clear" that Mahn was not under the influence of drugs or alcohol at the time.
Moreover, and contrary to the statements in the sentencing orders here, evidence that Mahn was "not under the influence of drugs or alcohol" when committing the offenses is not the correct standard for determining whether long-term substance abuse is mitigating. In Ross v. State, 474 So.2d 1170, 1174 (Fla.1985), we found the defendant's past drinking problems, among other things, to be "collectively ... a significant mitigating factor" even though the defendant himself testified he was "cold sober" on the night of the murder. Accord Penn v. State, 574 So.2d 1079 (Fla.1991) (defendant's heavy drug use was significant mitigation); Songer v. State, 544 So.2d 1010, 1011 (Fla. 1989) (finding several mitigating circumstances "particularly compelling," including unrebutted evidence defendant's "reasoning abilities were substantially impaired by his addiction to hard drugs"). Therefore, we find that the trial court erred in failing to give Mahn's extensive and uncontroverted history of drug and alcohol abuse appropriate weight as a nonstatutory mitigating circumstance. Spencer, Nibert; cf. Walker v. State, 707 So.2d 300, 318 (Fla.1997) (finding trial court erred in rejecting defendant's abusive childhood as nonstatutory mitigation and giving it no weight despite trial court's acknowledgment that evidence supported mitigator's existence).

Jury Override
Mahn contends that the trial court erred in overriding the jury's recommendation of life for Debra Shanko's murder. In Tedder v. State, 322 So.2d 908 (Fla.1975), we established the standard for a trial court's override of a jury recommendation of life imprisonment and held that in order "to sustain a sentence of death following a jury recommendation of life, the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ." Id. at 910.
Under that standard, taken individually and certainly in the aggregate, we agree with Mahn that the jury could have reasonably believed that the substantial evidence of mitigating circumstances presented in this case justified a life sentence. As we have stated regarding mitigating testimony, even though "some reasonable persons might disbelieve portions of this testimony, we have no doubt that other reasonable persons would be convinced by it." Carter v. State, 560 So.2d 1166, 1169 (Fla.1990). This holds even if based on nonstatutory mitigation. Irizarry v. State, 496 So.2d 822 (Fla.1986). Similarly, the jury could have found that Mahn struck out impulsively and to hurt his neglectful father by striking out at the teenage son of the father's girlfriend, and striking out impulsively at the son's mother when he was caught in the act.
Even if the jury did not accept the uncontested testimony of Mahn and his friends about his extensive substance abuse history, the jury certainly could have placed substantial weight, as did the trial court, on Mahn's *402 dysfunctional family background, lack of parenting, and history of childhood abuse. That evidence was presumably all the more powerful and persuasive considering that one of the main abusers, Mahn's mother, testified at length to her own and others' physical and mental abuse of her son. Significantly, as with Mahn's drug and alcohol abuse, the State did not controvert Mahn's long history of physical and mental abuse at home.
Our prior decision in Amazon v. State, 487 So.2d 8 (Fla.), cert. denied, 479 U.S. 914, 107 S.Ct. 314, 93 L.Ed.2d 288 (1986), is closely analogous to this case, if not more egregious on its facts. In Amazon, the nineteen-year-old defendant broke into his next door neighbor's house, raped the mother, and then eventually murdered both the mother and her eleven-year-old daughter. Amazon was convicted of first-degree murder on both counts, sexual battery, and burglary. Id. at 10. After the jury recommended life sentences on both counts, the trial judge found no mitigating factors, overrode the advisory sentence and sentenced Amazon to death. Id. Upon appeal, we reversed the death sentences, being "persuaded that the jury could have properly found and weighed mitigating factors and reached a valid recommendation of life imprisonment." Id. at 13. Relevant to our review in the instant case are the following findings:
There was some inconclusive evidence that Amazon had taken drugs the night of the murders, stronger evidence that Amazon had a history of drug abuse, and testimony from a psychologist indicated Amazon was an "emotional cripple" who had been brought up in a negative family setting and had the emotional maturity of a thirteen-year-old with some emotional development at the level of a one-year-old. Age could also be found as a mitigating factor. Although Amazon was nineteen, an age which we have held is not per se a mitigating factor [,] the expert testimony about Amazon's emotional maturity suggests that the jury could have properly found age a mitigating factor in this case.
Id. (citation omitted). Obviously, Amazon presents strong parallels to this case.
We conclude that the jury's recommendation of life for the murder of Debra Shanko was not so unreasonable as to permit the trial court to override the jury's recommendation. See also Esty v. State, 642 So.2d 1074, 1080 (Fla.1994), cert. denied, 514 U.S. 1027, 115 S.Ct. 1380, 131 L.Ed.2d 234 (1995) (concluding jury override was improper where, despite CCP and HAC aggravators, "jurors could have relied on the [substantial mitigation] established in the record to recommend a life sentence").

CROSS-APPEAL

Felony Murder Aggravating Circumstance
The State contends that the trial court erred in not finding the combined aggravating factors of murder in the course of a robbery and murder for pecuniary gain. However, we find that the trial court did not abuse its discretion in rejecting this aggravator. In its sentencing order the court accepted Mahn's argument that his taking of the $400 was an "afterthought" and "only incidental to the killing[s]." Moreover, Jones v. State, 652 So.2d 346, 350 (Fla.1995), a case the State relies on, is distinguishable because there we rejected the defendant's "afterthought" argument primarily based on his statement that he killed the victims because they "owed" him money. In this case, Mahn made no comparable statement, nor was there any evidence that pecuniary gain was the motive behind the murders. Accordingly, we affirm the trial court's rejection of this aggravating circumstance.

Avoid Arrest/Prevent Lawful Arrest Aggravating Circumstance
The State also claims that the trial court erred in not finding that the murders were committed to avoid arrest. We have stated that in applying the avoid arrest factor when the victim is not a law enforcement officer, strong proof of a defendant's motive is required. Riley v. State, 366 So.2d 19 (Fla.1978). Furthermore, it must be clearly shown that the dominant or only motive for the killing was witness elimination. Bates v. State, 465 So.2d 490 (Fla.1985); Oats v. State, 446 So.2d 90 (Fla.1984).
*403 Under those standards, we find the trial court did not abuse its discretion in rejecting this aggravator. In Mahn's statement to the Oklahoma police, he said that after Debra entered the room, "she tried to get me, and I struck her too, stabbed her." Thus, the trial court did not abuse its discretion in concluding in its sentencing order that "it cannot be said that [the aggravating factors] have been proven beyond a reasonable doubt." Therefore, we affirm the trial court's rejection of this aggravating circumstance.

CONCLUSION
In summary, we affirm Mahn's first-degree murder convictions, but remand with directions that his sentence for Debra Shanko's murder be reduced to a life sentence without eligibility for parole for twenty-five years. As to the murder of Anthony Shanko, we reverse and remand for a new penalty phase proceeding before a new jury. We also reverse Mahn's armed robbery conviction and remand to the trial court with directions to enter a judgment of conviction for grand theft on that count and to sentence Mahn accordingly.
It is so ordered.
KOGAN, C.J., and OVERTON, SHAW and ANSTEAD, JJ., concur.
HARDING, J., concurs in part and dissents in part with an opinion.
WELLS, J., concurs in part and dissents in part with an opinion, in which GRIMES, Senior Justice, concurs.
HARDING, Justice, concurring in part and dissenting in part.
I concur with the majority opinion in all respects except one. I would not reverse the trial court's finding of the CCP aggravating factor. I find there is clearly sufficient evidence to support the trial judge's conclusion that CCP existed in this case. Therefore, I believe this case should be remanded to the trial judge in order to reweigh the aggravating and mitigating factors, in light of the majority opinion's analysis regarding the age and drug and alcohol abuse mitigating factors.
WELLS, Justice, concurring and dissenting.
I concur as to the affirmance of the first-degree murder convictions. I concur that the trial judge's override of the jury's recommendation of life imprisonment for the murder of Debra Shanko should be reversed and remanded with directions that the sentence be in accord with the jury's recommendation. I concur that the trial judge did not abuse his discretion in finding HAC. I concur that the trial court did not err in respect to the mental statutory or nonstatutory mitigation.
I dissent as to the remainder of the decision reversing the sentence of death for the murder of Anthony Shanko. I would affirm the jury's verdict as to the robbery conviction. The taking of the motor vehicle was part of the continuous sequence of events in the criminal episode sufficient for the jury to have convicted on the robbery charge in accord with this Court's decision in Jones v. State, 652 So.2d 346 (Fla.1995).
I dissent from the reversal of the trial judge's finding of CCP. In his sentencing order, the trial judge explained his finding:
2. The capital felony was a homicide and was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.
The Defendant told several witnesses that he was jealous of the time his father gave to Debbie and Anthony Shanko. Anthony Shanko was in his own home, in his own bed, under his own comforter on his bed when the Defendant went to the kitchen and took two large kitchen knives. The Defendant by his own admission started to stab Anthony Shanko when Anthony was asleep and stabbed him up to eight times with one of the large kitchen knives. The Defendant by his own admission waited until his father left the house that night before he committed the murder of Anthony Shanko. The Defendant by his own admission says Anthony Shanko did not deserve this, but he was mad that his father had sold his automobile the day of the murder because the Defendant had defaulted upon his agreement to make the automobile payments. The evidence has *404 established that the Defendant's father had a great deal of love for Anthony Shanko. The Defendant felt that his father was not there for him as a child when he was growing up with his mother. The Defendant by his own admission stated that he had thought about killing Anthony Shanko, because he thought that Anthony would die immediately rather than fight and cry and scream. The evidence does not support nor does the Defendant claim that he had any moral or legal justification. The aggravating circumstance was proved beyond a reasonable doubt.
I conclude that the trial judge's determination that CCP applied was within his discretion and in accord with this Court's decision in Occhicone v. State, 570 So.2d 902 (Fla. 1990). The majority simply substitutes its judgment for that of the trial judge, which this Court said specifically in Occhicone that it would not do in reference to this same aggravator. Id. at 905.
I dissent from the majority's reversal of the trial court's judgment on age as statutory mitigation. Again, the majority simply substitutes its judgment for that of the trial judge. I dissent from the majority's decision that the trial judge erred in the weight he gave to drug and alcohol abuse as nonstatutory mitigation. The majority ignores the numerous cases in which this Court has held that the trial judge must consider the evidence of nonstatutory mitigation in the record, but the weight to be given to that evidence as mitigation is within the discretion of the trial judge. Windom v. State, 656 So.2d 432 (Fla.1995); Campbell v. State, 571 So.2d 415 (Fla.1990).
Since this case is being remanded for a new sentencing trial, I dissent from the affirmance of the trial court's not finding murder in the course of a felony based upon the robbery of the vehicle.
I concur as to the affirmance of the trial court's rejection of the avoid-arrest aggravator.
GRIMES, Senior Justice, concurs.
NOTES
[1] For each murder, the trial court found in aggravation: (1) the defendant had been convicted of a prior violent felony, section 921.141(5)(b), Florida Statutes (1993); (2) the murders were especially heinous, atrocious, or cruel, section 921.141(5)(h), Florida Statutes (1993); and (3) the murders were committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification, section 921.141(5)(i), Florida Statutes (1993). The court found the following nonstatutory mitigating factors and accorded them substantial weight: (1) defendant's family background; and (2) abuse of the defendant by his parents. The court found the following nonstatutory mitigating factors and accorded them little weight: (1) defendant's remorse; (2) defendant's potential for rehabilitation; (3) defendant's mental problems that do not reach the level of statutory mitigating factors; and (4) defendant's voluntary confession. Finally, the court gave no weight to the alleged alcohol and drug use/dependency nonstatutory mitigating factor.
[2] Mahn's claims are as follows: (1) the trial court erred in permitting appellant's restraint during portions of the trial by use of a remotely activated electric stun device; (2) the trial court erred in submitting the charge of robbery to the jury based on insufficient evidence; (3) the trial court erred in finding that the homicides of Anthony and Debra Shanko were cold, calculated, and premeditated; (4) the trial court erred in finding that the homicides of Anthony and Debra Shanko were heinous, atrocious, or cruel; (5) the trial court erred in relying on appellant's 1992 robbery conviction to support the "prior violent felony" aggravating circumstance; (6) the trial court erred in rejecting as statutory mitigators that appellant suffered from an extreme mental or emotional disturbance at the time of the homicides and that appellant's capacity to appreciate the criminality of his acts was substantially impaired; (7) the trial court erred in failing to give sufficient weight to appellant's mental problems as a nonstatutory mitigating circumstance; (8) the trial court erred in rejecting appellant's age of twenty years old as a statutory or nonstatutory mitigating circumstance; (9) the trial court erred in rejecting appellant's drug and alcohol abuse as a nonstatutory mitigating circumstance; (10) the trial court erred in overriding the jury's recommendation of a life sentence for the homicide of Debra Shanko; (11) the death sentence is a disproportionate penalty in this case; (12) the trial court erred in giving the standard jury instruction to define the cold, calculated and premeditated aggravating circumstance; (13) the trial court erred in giving the standard jury instruction to define the heinous, atrocious, or cruel aggravating circumstance.
[3] Claim (1) is procedurally barred as it was not properly preserved for appellate review, but assuming arguendo that it was, we find no error. Davis v. State, 461 So.2d 67 (Fla.1984), cert. denied, 473 U.S. 913, 105 S.Ct. 3540, 87 L.Ed.2d 663 (1985). Claim (13) has been previously rejected by this Court and does not merit additional discussion. The State raises four claims on cross-appeal. Cross-claims (1) and (2) are mooted by our affirmance of Mahn's first-degree murder convictions.
[4] Mahn also asserts as error the giving of a CCP jury instruction we declared unconstitutional in Jackson v. State, 648 So.2d 85, 90 (Fla.1994). Because we are reversing on the finding of CCP in this case, that issue is moot.
[5] See Appellee's Answer Brief at 72.
[6] At the close of her comments on CCP, the prosecutor stated:

It was cold, it was calculated and it was premeditated. It was so premeditated that he had it planned in his mind as to how they would react. He thought that he could stab them once and they would die. But they didn't. His plan was to stab them once and kill them. But he didn't succeed. He calculated it and thought about it to such a degree that he even planned their reactions. So it's clear that [this] is an aggravating factor that applies to this particular case.
[7] We have also recently held in Robinson v. State, 692 So.2d 883 (Fla.1997), that purse snatching is not a crime of violence sufficient to constitute robbery.
[8] By his own testimony, Mahn confessed to committing the killings at approximately 11 p.m. on April 1, 1993. He was nineteen years old at the time. He turned twenty the next day, April 2, 1993. Therefore, the trial court was technically incorrect.
[9] Under the laws of this and most states, Mahn could not legally drink alcohol until the age of twenty-one. Legislatures have clearly made the policy choice that people under that threshold age are generally too immature to use alcohol responsibly. Therefore, if that presumption is considered in conjunction with Mahn's considerable substance abuse and mental health problems, there is little doubt that his chronological age should have been considered a mitigating factor.