591 So.2d 618 (1992)
Samuel Andrew PETTIT, Appellant,
v.
STATE of Florida, Appellee.
No. 75565.
Supreme Court of Florida.
January 9, 1992.
*619 Gregory N. Burns, Fort Myers, for appellant.
Robert A. Butterworth, Atty. Gen., and Robert J. Landry, Asst. Atty. Gen., Tampa, for appellee.
PER CURIAM.
Pursuant to article V, section 3(b)(1), Florida Constitution, we review the judgment of guilt of first-degree murder and the imposition of a death sentence imposed therefor on Samuel Andrew Pettit. We affirm both.
The record reflects that, during the evening of August 17, 1988, Pettit, armed with a handgun, accosted Kathleen Finnegan and Norman Langston in a parking lot. He forced them into Langston's car and directed Langston to drive to a secluded clearing near a creek. During the ride, Pettit made Finnegan give him her earrings, watch, and money. Pettit also took Langston's watch and money. When they reached their destination, Pettit shot them four times and left. Although wounded, Finnegan managed to summon help and survived. Langston, shot twice in the head, died two days later.
Prior to this incident, Pettit had his cousin procure a handgun for him so that he could commit armed robberies. Afterwards, the cousin turned Finnegan's watch and earrings over to the authorities and said that Pettit gave the items to him and that Pettit had confessed to him. Pettit also confessed to two friends who gave him a ride to Naples and to a man who repaired the handgun.
Naples police found Pettit sleeping on the beach about 12:30 a.m. on August 19. They removed the handgun used in this murder/robbery from his pocket and arrested him for carrying a concealed weapon. The State indicted Pettit for first-degree murder, attempted first-degree murder, kidnapping, and armed robbery. On September 1, 1988 the trial court appointed two attorneys to represent Pettit.
Sometime in 1989 Pettit started refusing to cooperate with his attorneys and expressed his desire to plead guilty. The court appointed three mental health experts to examine Pettit, and at a competency hearing in early September 1989 they testified (two in person and the third through a written report) that Pettit was competent. Because of his refusal to cooperate, Pettit's counsel had filed a motion to withdraw in August 1989. Two weeks after the competency hearing, the court heard the motion to withdraw. At that hearing Pettit continuously expressed his intent either to plead guilty or to take the stand and confess and was adamant in his refusal to follow his attorneys' advice. At the end of the hearing the court discharged Pettit's attorneys and accepted his guilty *620 plea. The sentencing procedure had been explained to Pettit and he stated his intention not to present any mitigating evidence. The State, however, asked the court to appoint medical experts to examine Pettit to determine if his health presented any physical or mental mitigators. The court appointed the requested doctors, and the penalty phase began on October 12, 1989.
The State presented several witnesses, who testified to the facts of this case. When the State rested, it asked the court to take judicial notice of the prior competency hearing and of the mental health experts' testimony and report. The court then stated that it wanted to hear the two neurologists who had been appointed to examine Pettit. Those doctors testified that, although Pettit had been diagnosed with Huntington's chorea, the disease had not progressed far enough to have caused these crimes and that the statutory mental mitigators did not apply to Pettit. Pettit's grandfather also testified.
After that, the court imposed the death sentence, finding under sentence of imprisonment, prior violent felony, and committed during a felony in aggravation. He found no mitigation. The court then appointed an attorney to represent Pettit on appeal.
The first issue raised on appeal is whether the court erred in allowing Pettit's counsel to withdraw and allowing Pettit to plead guilty and be unrepresented at the penalty phase. The record discloses that the trial judge took great care in ascertaining Pettit's desires and in determining his capacity to exercise his free will and choice to proceed as he did. The record supports his conclusion that it was Pettit's desire and that he had full mental capacity to make an informed decision in this regard. We considered a similar situation in Hamblen v. State, 527 So.2d 800 (Fla. 1988), and resolved the issue of whether a convicted murderer could waive the presentation of mitigating evidence. Over the thought-provoking argument of two dissenters we held that he could, but emphasized that the trial judge must carefully analyze the possible statutory and nonstatutory mitigating factors against the aggravators to assure that death is appropriate. We are not unaware of the problems arising out of the imposition of the death penalty when mitigating evidence is not actively pursued by the defendant or someone on his behalf, but we adhere to our rule in Hamblen that a competent defendant can waive its presentation.
The trial judge performed this task in this case. He was particularly concerned with the effect of Pettit's having a condition known as Huntington's chorea. He required Pettit's examination by physicians and required their testimony in reference to the voluntariness of Pettit's guilty plea and for the presence of mitigating circumstances. He received the testimony of Pettit's grandfather in reference to the devastating and progressively deteriorating effect that Huntington's chorea has on a person.[1] The trial judge also received a presentence investigation report. He wrote his findings out longhand and then had them typed after concluding, despite Pettit's physical condition and history as reported to the doctors and by the grandfather, that no mitigating circumstances had been established.
Pettit's appellate counsel[2] also contends that the trial judge failed to consider nonstatutory mitigation. The sentencing order itself does not mention the word "nonstatutory." We conclude, however, that by his treatment of Pettit's physical condition and by allowing the testimony of the grandfather, the judge fully understood the requirement of considering, and did consider, nonstatutory mitigating evidence.
Finally, Pettit's appellate counsel urges that the trial judge erred in finding that Pettit was under sentence of imprisonment when he committed these offenses. *621 The State claimed that he was serving the probation part of an apparent split sentence, but the record is not clear on this. In any case, however, we have ruled that a person on probation is not under sentence of imprisonment. E.g., Trotter v. State, 576 So.2d 691 (Fla. 1990).
We conclude, however, that striking that aggravator would not have affected the sentence. This was an aggravated crime committed by one who has a dismal criminal record and who has exhibited no socially redeeming virtues. His only possible mitigation has been his life's personal tragedy of neglect and having an inherited debilitating physical ailment that will cause an early, painful deterioration of body and mind. While this might be significant, the decision as to whether mitigation has been established lies with the trial court. Sireci v. State, 587 So.2d 450 (Fla. 1991). Competent, substantial evidence supports the rejection of mitigating circumstances, see Ponticelli v. State, 593 So.2d 483 (Fla. 1991), and sufficient aggravating factors exist to support the trial judge's conclusion that death is appropriate in this case. We therefore affirm the judgment of guilt and the sentence of death.
It is so ordered.
SHAW, C.J. and OVERTON, McDONALD, GRIMES, KOGAN and HARDING, JJ., concur.
BARKETT, J., concurs in part and dissents in part with an opinion.
BARKETT, Justice, concurring in part, dissenting in part.
I concur in the affirmance of guilt. However, for the reasons expressed in my dissenting opinion in Hamblen v. State, 527 So.2d 800, 806-809 (Fla. 1988) (Barkett, J., dissenting as to the penalty), I would remand for a new sentencing proceeding with instructions that the trial court appoint public counsel to advocate mitigation.
NOTES
[1] Pettit's father committed suicide while suffering from this condition and his grandmother died from it.
[2] Pettit did not want to appeal or have counsel for his appeal, but we determined that this wish could not be granted because we have an absolute statutory obligation to review every death sentence.